# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 26, 2011

No. 10-20305

Lyle W. Cayce
Clerk

RALPH KLIER,

Appellant

v.

ELF ATOCHEM NORTH AMERICA, INC.,

Defendant–Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, Chief Judge, and HIGGINBOTHAM and SOUTHWICK, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This appeal arises from the settlement of a class action. The defendant paid substantial sums for res judicata protection from the claims of persons assertedly injured by the toxic emissions of an industrial plant near Bryan, Texas. The monies were allocated among three subclasses, one of which was to receive medical monitoring. Upon the monitoring program's completion, substantial sums remained unused. The district court denied the settlement administrator's request to distribute the unused medical-monitoring funds to another subclass of persons suffering serious injuries. Instead, the court

No. 10-20305

repaired to the doctrine of *cy pres* and ordered that the money be given to three charities suggested by the defendant and one selected by the court.

The gift of class funds to charity is attacked on two fronts: that the district court moved too quickly from the terms of the settlement agreement to a *cy pres* distribution, and alternatively that the district court neglected a prerequisite of the *cy pres* doctrine by not selecting charities with a sufficient nexus to the underlying substantive objectives of the class suit. Persuaded by the first contention, we do not reach the second. We hold that the district court abused its discretion by ordering a *cy pres* distribution in the teeth of the bargained-for terms of the settlement agreement, which required residual funds to be distributed within the class. We reverse the district court's order distributing the unused medical-monitoring funds to third-party charities and remand with instructions that the district court order that the funds be distributed to the subclass comprising the most seriously injured class members.

## I.

Lillian Hayden and five others instituted this action in April of 1992 by filing suit in state district court in Brazos County, Texas. Seeking to represent themselves and a class of others similarly situated, they sought compensation for exposure to arsenic and other toxic chemicals alleged to have been emitted into the air around Bryan, Texas, by an agrochemicals plant owned and operated by the defendant, Arkema, Inc. (formerly known as Elf Atochem North America, Inc.). The defendant removed the case to federal court supported by diversity jurisdiction.

Settlement of this aging suit had several iterations as it confronted the changing jurisprudence of federal class actions. The first settlement, confected three years after the filing of the state-court suit, proposed to terminate the suit with about $55 million in payments to a class certified under Federal Rule of

No. 10-20305

Civil Procedure 23(b)(2) with no opt-out provisions.[1] This class was quickly undercut on appeal by our intervening decision in *Allison v. Citgo Petroleum Corp.*[2] There we made plain that where the predominant relief sought is an award of money damages, class certification must proceed through the (b)(3) gate, with its mandatory opt-out provisions.[3] On remand from this Court and now proceeding under Rule 23(b)(3), the parties entered into a new settlement agreement. The settlement was reduced to $41.4 million, a reduction reflecting the value of individual settlements reached with opting-out class members.

The settlement agreement created three subclasses and allocated to each subclass a portion of the $41.4 million settlement. The agreement allocated $23.34 million to Subclass A, which was defined to include all persons who lived or worked near the plant between 1973 and 1995 and had contracted any form of cancer, endured a pregnancy that ended in stillbirth, or suffered from any of several enumerated birth defects. A settlement administrator appointed by the district court distributed the funds pro rata pursuant to an agreed-upon grid deployed to score illness, its onset, and its seriousness. Ralph Klier, our appellant here, was a member of Subclass A. Klier had lived close to the plant and suffered from peripheral neuropathy and leukemia, the treatments for which so weakened his heart that he required open-heart surgery in 2003. He received $6,500 in settlement proceeds.

The settlement agreement allocated approximately $6.46 million to Subclass B. Its members were not required to demonstrate physical injury; the district court referred to Subclass B as the "nuisance-exposure/future claims"

---

[1] *See generally* FED. R. CIV. P. 23(c)(2)(B)(v).

[2] 151 F.3d 402 (5th Cir. 1998), *adopted by Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).

[3] *Id.* at 413.

subclass. If its members met proximity-to-plant and exposure standards, they could either recover a small compensation sum or elect to participate in a medical-monitoring program, which was funded by $2 million of the proceeds allocated to the subclass. The remaining $4.46 million funded payments to the more than 12,000 subclass members who elected not to participate in the program. Responsive to the risk of latent illness, the settlement also gave members of Subclass B—who by definition had suffered no injury or illness as a result of their arsenic exposure as of the signing of the agreement—back-end opt-out rights. Any member of Subclass B who later developed an arsenic-related cancer or birth defect for which they could meet standards of general causation retained the right to file a new lawsuit against Arkema.

Finally, $10.6 million was allocated to Subclass C, which included all class members who, during the class time frame, owned property that was located within the portion of the class area that was exposed to the highest levels of arsenic emissions. The funds were to compensate members of Subclass C for property damage and diminution in property value.

At issue on this appeal is the district court's use of the *cy pres* doctrine to dispose of approximately $830,000 that went unused during the administration of the medical-monitoring program created for the benefit of Subclass B. The program allowed members of Subclass B to forego receipt of a small cash payment and instead enroll in a program through which they would receive regular checkups and physician visits over a five-year period. The aim was to assist members of the subclass in monitoring their health for any indication that they were developing an arsenic-related illness. Two primary factors contributed to the program's not exhausting its allocated funds. First, the initial participation rate was low. Some 329 members of Subclass B—less than three percent of the total subclass membership—opted to receive medical monitoring in lieu of a cash payment; just 221 attended their first monitoring examination.

No. 10-20305

Second, in the course of this monitoring, no significant health problems were found. Among those who initially chose to participate, demand for monitoring greatly diminished, yielding a high dropout rate. Only 46 class members participated in all three rounds of screening as scheduled.

As activity in the case subsided, the settlement administrator filed a status report in which he stated that the medical-monitoring program had come to a close and that approximately $830,000 had gone unused and needed to be distributed by the district court. The parties were in agreement that an additional distribution to the members of Subclass B was not economically feasible. The district court asked the parties for proposals for distribution of remaining funds. Taking an inexplicably narrow view of their duty to the class, class counsel did not respond. The defendant proposed seven entities as potential beneficiaries of a *cy pres* distribution: five local charities, the Bryan Independent School District, and the city of Bryan.

Klier opposed the proposal. He urged that the monies set aside but not drawn down for medical monitoring be distributed pro rata to members of Subclass A. Klier argued that an additional distribution to the members of Subclass A was economically feasible and would be equitable since the members of Subclass A had been found to suffer from arsenic poisoning, related cancers, and birth defects that are compensable under the settlement. In the alternative, Klier argued that the defendant's proposed charities were not proper recipients under the doctrine of *cy pres*, lacking a sufficient nexus to the injuries of the class or the principles the class action sought to vindicate. Klier proposed that the money instead be used to fund arsenic-pollution research at Texas A&M University.

In April of 2010, some eighteen years after this litigation commenced and fourteen years after the closing of the plant, the district court ordered distribution of the remaining funds to three of the charities proposed by the

5

No. 10-20305

defendant: a scholarship program called Arkema New Horizons Scholarships and two museums. The court then added a charity of its own, a local history and genealogy library. The money was to be distributed in four equal shares. Despite having pledged several years before to consider a proposal to reallocate the medical-monitoring funds to other members of the class,[4] the court never addressed Klier's primary request that the monies be distributed to the members of Subclass A, denying it only implicitly. Instead, the district court proceeded directly to Klier's alternative proposal that the money be donated to Texas A&M, which it rejected because it would not benefit the Bryan community. The district court expressed its view that the distributions it ordered would provide benefits "perhaps to friends and relatives of the claimants, perhaps to total strangers who happen to live in Bryan."

## II.

When modern, large-scale class actions are resolved via settlement, money often remains in the settlement fund even after initial distributions to class members have been made because some class members either cannot be located or decline to file a claim. Federal district courts often dispose of these unclaimed finds by making what are known as *cy pres* distributions. *Cy pres* is an equitable doctrine that has been imported into the class-action context from the field of trust law:

> The *cy pres* doctrine takes its name from the Norman French expression, *cy pres comme possible*, which means "as near as possible." The doctrine originated to save testamentary charitable gifts that would otherwise fail. Under *cy pres*, if the testator had a general charitable intent, the court will look for an alternate recipient that will best serve the gift's original purpose. In the class action context, it may be appropriate for a court to use *cy pres* principles to distribute unclaimed funds. In such a case, the

---

[4] The content of and reasons for this earlier pledge are detailed *infra,* slip op. at 12.

6

unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated.[5]

In the class-action context, a *cy pres* distribution is designed to be a way for a court to put any unclaimed settlement funds to their "'next best compensation use, e.g, for the aggregate, indirect, prospective benefit of the class.'"[6]

We review for an abuse of discretion a district court's decision to resort to the *cy pres* doctrine for the distribution of unclaimed class-action settlement funds.[7]  By definition, a district court abuses its discretion when it makes an error of law or applies an incorrect legal standard.[8]  As to errors of this latter type, our review is de novo,[9] as is our review of the district court's interpretation of an unambiguous settlement agreement.[10]

## A.

We begin our analysis with a return to basic principles.  As we will explain, these core principles control and decide this appeal.  First there is the ever-antecedent and overarching limitation on class-action litigation, the Rules Enabling Act.  The Federal Rules of Civil Procedure cannot work as substantive

---

[5] *In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 682 (8th Cir. 2002) (internal citations and quotation marks omitted).

[6] *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007) (quoting 3 WILLIAM B. RUBENSTEIN ET AL., NEWBERG ON CLASS ACTIONS § 10.17 (4th ed. 2002) (emphasis omitted)).

[7] *See Wilson v. Sw. Airlines, Inc.*, 880 F.2d 807, 811 (5th Cir. 1989); *see also In re Holocaust Victims Assets Litig.*, 413 F.3d 183, 185 (2d Cir. 2005) (per curiam); *Powell v. Ga. Pac. Corp.*, 119 F.3d 703, 706 (8th Cir. 1997).

[8] *Koon v. United States*, 518 U.S. 81, 100 (1996).

[9] *Benavides v. Chi. Title Ins. Co.*, 636  F.3d 699, 701 (5th Cir. 2011).

[10] *Guidry v. Halliburton Geophysical Servs., Inc.*, 976 F.2d 938, 940 (5th Cir. 1992).

No. 10-20305

law.[11] This core stricture demands a narrow construction of Rule 23, which must be "applied with the interests of absent class members in close view."[12] Second, a class settlement generates property interests. Each class member has a constitutionally recognized property right in the claim or cause of action that the class action resolves.[13] The settlement-fund proceeds, having been generated by the value of the class members' claims, belong solely to the class members.[14]

These precepts define the first—and often the last—arena of analysis, imposing foundational limitations on a district court's discretion as it administers a class-action settlement. Because the settlement funds are the property of the class, a *cy pres* distribution to a third party of unclaimed settlement funds is permissible "only when it is not feasible to make further distributions to class members."[15] Where it is still logistically feasible and economically viable to make additional pro rata distributions to class members,

---

[11] 28 U.S.C. § 2072.

[12] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 629 (1997).

[13] *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 807–08 & 812–13 (1985); *Logan v. Zimmerman Brush Co.*, 455 U.S. 442, 428–30 (1982).

[14] *See* AM. LAW INST., PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (hereinafter, "ALI PRINCIPLES") § 3.07 cmt. b (2010) ("[F]unds generated through the aggregate prosecution of divisible claims are presumptively the property of the class members . . . .").

[15] *Id.* § 3.07 cmt. a; *see also* 3 WILLIAM B. RUBENSTEIN ET AL., NEWBURG ON CLASS ACTIONS § 10.17 (4th ed. 2002, Westlaw updated through June 2011) ("When all or part of the common fund is not able to be fairly distributed to class members, the court may determine to distribute the unclaimed funds with a *cy pres* . . . approach."). In large class actions, substantial administrative costs attend the distribution of settlement funds. As the settlement funds are disbursed and the amount still available for distribution to the class declines, there comes a point at which the marginal cost of making an additional pro rata distribution to the class members exceeds the amount available for distribution. *See, e.g.*, *In re Am. Tower Corp. Secs. Litig.*, 648 F. Supp. 2d 223, 224 n.1 (D. Mass. 2009). It is only at this point that a district court has discretion to order a *cy pres* distribution. *See* ALI PRINCIPLES § 3.07 cmt. b (explaining that *cy pres* awards are appropriate "only when direct distributions to class members are not feasible—either because class members cannot be reasonably identified or because distribution would involve such small amounts that, because of the administrative costs involved, such distribution would not be economically viable").

the district court should do so,[16] except where an additional distribution would provide a windfall to class members with liquidated-damages claims that were 100 percent satisfied by the initial distribution.[17] A *cy pres* distribution puts settlement funds to their next-best use by providing an indirect benefit to the class. That option arises only if it is not possible to put those funds to their very best use: benefitting the class members directly.

Because a district court's authority to administer a class-action settlement derives from Rule 23, the court cannot modify the bargained-for terms of the settlement agreement.[18] That is, while the settlement agreement must gain the approval of the district judge,[19] once approved its terms must be followed by the court and the parties alike. The district judge must abide the provisions of the settlement agreement, reading it to effectuate the goals of the litigation. This is not a free exercise of *cy pres*, but a determination of how the settlement agreement's many provisions define the class's property interests and allocate

---

[16] *See* ALI PRINCIPLES § 3.07 cmt. b ("[A]ssuming that further distributions to the previously identified class members would be economically viable, that approach is preferable to cy pres distributions."); *cf.* EDWIN S. NEWMAN, LAW OF PHILANTHROPY 27 (1955) *("Cy pres* is only a last resort, to be invoked where it is totally impossible for a trustee to realize the objectives of the trust's creator through reasonable interpretation of the trust agreement."), *quoted in* Danshera Cords, *Charitable Contributions for Disaster Relief: Rationalizing Tax Consequences and Victim Benefits*, 57 CATH. U. L. REV. 427, 461 n.240 (2008).

[17] *See Wilson*, 880 F.2d at 812–13 (noting that the class members could not assert an equitable claim to the unclaimed settlement funds because all class members who came forward had been paid the full amount of their liquidated back-pay damages); *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 34–35 (1st Cir. 2009) (affirming a *cy pres* distribution as part of a settlement agreement in an antitrust class action where the settlement paid all class members treble damages). This limitation is an important component of the decision principle in *Wilson*: a *cy pres* distribution of unclaimed settlement funds is appropriate only when it is not feasible to distribute those funds to any party to the class action who has a persuasive equitable claim to those funds. *See infra* note 21 and accompanying text. A party whose liquidated-damages claim has been fully satisfied cannot make a persuasive equitable claim to any residual settlement funds.

[18] *Evans v. Jeff D.*, 475 U.S. 717, 726–27 (1986).

[19] *See* FED. R. CIV. P. 23(e).

No. 10-20305

those interests once created.[20]   The terms of the settlement agreement are always to be given controlling effect.[21]   *Cy pres* comes on stage only to rescue the objectives of the settlement when the agreement fails to do so.  Even then, the court's discretion remains tethered to the interest of the class, the entity that generated the funds.

### B.

It is apparent from its structure that the settlement contract between Arkema and the class contemplated that each subclass would first draw upon the sums allocated to it.  The parties memorialized their settlement in two documents: the Class Action Settlement Agreement ("the Agreement") and the Protocol for Distribution of Settlement Fund ("the Protocol").  As relevant here, the Agreement created and defined the three subclasses and allocated a designated portion of the total settlement proceeds to the three subclass funds.  Class members were eligible for payments from the subclass funds pursuant to the procedures and processes set forth in the Protocol.  The Agreement specifies that each subclass fund shall be used to fund payments to the members of its assigned subclass.  Arkema points out that paragraph 27 of the Protocol directs that any money left over in any subclass fund "shall be distributed pro rata to all Claimants in that subclass." Arkema argues that this ends the matter: Abiding the contract, the district court had no authority to allocate funds not drawn down by one subclass to the members of another subclass, even Subclass

---

[20] The concurrence usefully recites important concerns now being voiced regarding the use of *cy pres* by district courts managing class settlements.  The concurrence's focus is on the problems attending the unfettered use of *cy pres*.  When a court looks beyond or must resolve uncertainty in the terms of the settlement agreement, complications will arise. But as long as courts attend to the fact that they are allocating the class members' property, there should be little occasion to sail near those shoals.

[21] Of course, the district court has inherent equitable authority to resolve any issues that are not covered by the terms of the settlement agreement.  *See* MANUAL FOR COMPLEX LITIGATION, FOURTH § 21.66, at 334 (Federal Judicial Center 2004).

No. 10-20305

A, whose members were the most grievously injured and had not been fully compensated.

Arkema's argument is flawed at several junctures. To begin with, Arkema concedes that paragraph 27's directive could not have been followed here: the leftover funds were allocated to Subclass B, and it is not economically viable to distribute those funds pro rata to the 12,657 members of Subclass B. Arkema accepts the precept that even an explicit directive of the settlement contract need not be followed if it is not feasible to do so.

Even if the Protocol stopped here, and it did not, the contention that want of feasibility freed the district court to donate the residual property interest of the class to charity is mistaken. This is not a case where the settlement agreement itself provides that residual funds shall be distributed via *cy pres*.[22] Quite the opposite: the district court's decision to distribute the unused funds via *cy pres* finds no support in the text of the settlement documents. Indeed, Arkema itself would appear to have a greater claim to the funds than a charity, however worthwhile the charity, absent a contrary directive from the property-interest-defining settlement agreement.[23]

But the Protocol is not so silent as the defendant would have it. Paragraph 28 provides: "The District Court may make changes to the terms of

---

[22] *See, e.g.*, *Gates v. Rohm & Haas Co.*, No. 06-1743, 2011 WL 1103683, at *1 (E.D. Pa. Mar. 24, 2011) (unpublished) (making a *cy pres* distribution where the settlement agreement provided that the district court was to pay over any "excess undistributed Medical Monitoring Settlement Class funds" to "a local Section 501(c)(3) charity for the benefit of" the village that encompassed the class area).

[23] *See Wilson*, 880 F.2d at 816 (holding that it is an abuse of discretion for a district court to order a *cy pres* distribution when any party to or participant in a class action—including the defendant and class counsel—has a valid equitable interest in the unclaimed settlement funds).

this protocol as necessary for the benefit of the Settlement Class Members."[24] This provision is but a limited grant of authority to the district court. Importantly, the limitation imposed is that the district court must act for the benefit of the class as a whole. Neither its authority nor its duty[25] is cabined off on a subclass-by-subclass basis. If it is not feasible to distribute the funds under paragraph 27, paragraph 28 controls, and it authorizes the district court to provide a benefit to the settlement-class members. "There is no indirect benefit to the class from the defendant's giving the money to someone else,"[26] and Arkema falls silent on the reality that it was feasible to allocate the funds to Subclass A.

This is enough, but there is more in this Protocol. Paragraph 29 further provides, "The Settlement Administrator may petition the District Court for reallocation of available funds among the [subclasses] on a showing of good cause if . . . he determines that considerations of equity and fairness require reallocation." About a year after medical monitoring began, the settlement administrator did exactly that, seeking leave to disburse any unused funds to other class members, "particularly those who are most seriously affected by exposure to chemicals." The district court denied this request, stating instead that it would "decide later what to do with the remainder of the medical monitoring fund." When that later date arrived, the court made no attempt to reconcile its decision to distribute the residue of the fund to third-party charities with the settlement administrator's prior request under paragraph 29.

---

[24] The Agreement defines the term "Settlement Class Members" to include the members of all three subclasses.

[25] *See In re Cendant Corp. Prides Litig.*, 233 F.3d 188, 194 (3d Cir. 2000) ("In a class action settlement, a court retains special responsibility to see to the administration of justice.").

[26] *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004).

No. 10-20305

The Protocol did more than merely empower the district court to allocate medical-monitoring funds unused by members of Subclass B to members of other subclasses—it required the court to do so for as long as further distributions were feasible and equitable. That it was not feasible to distribute these funds to members of Subclass B is not disputed. The feasibility of a further distribution to members of Subclass A is likewise conceded. And equity strongly favors an additional distribution to Subclass A. The members of Subclass B suffered no injuries or illnesses; those in Subclass A suffered serious personal injuries.[27] Claimants in Subclass A have already received some measure of compensation for their injuries, but it is far from full. The appellant here endured cancer, nerve damage, and a heart transplant and received $6,500 for his trouble. Subclass A's damages claims were non-liquidated and included claims for both actual and exemplary damages.

The very structure of Subclass B supports the entitlement of Subclass A. As we have explained, Subclass B was created to address the fears of latent disease harbored by persons who lived or worked within a defined proximity to the plant but who were asymptomatic. Access to medical monitoring, coupled with a back-end opt-out right to sue should injury later arrive, were the relief afforded. Both Subclass A and Subclass B addressed injury to the person. Members of the former had already incurred physical injury. Members of the latter were asymptomatic persons with a risk that injury of the type compensated in Subclass A might be later suffered. Addressing the risk of latent injury by definition meant dividing settlement monies between the two subclasses. The risk of Subclass B members was never realized. When

---

[27] The members of Subclass C suffered economic injury: damage to and loss of the value of property. These liquidated claims were fully compensated under the terms of settlement. Accordingly, none contends that the claimants in Subclass C have a persuasive equitable claim to the unused medical-monitoring funds. *See supra* note 16 and accompanying text.

significant injuries did not manifest themselves among members of Subclass B, the already light use of medical monitoring by its members declined even further, leaving the funds now at issue unspent. By the agreement, these monies were to provide a service to Subclass B members, not to compensate them for a later-arriving disease. In that event, they could sue, not having released their claims in the settlement. Members of Subclass A, by contrast, were prohibited from later opting out of the agreement. Res judicata protection against their claims was the most valuable consideration Arkema received in exchange for agreeing to the settlement.

Read, as they must be, with our core precepts at hand, the relevant provisions of the Protocol shape the property interest created by the Agreement and thereby constrain the district court's discretion in disposing of that property. The Protocol is an affirmation that funds initially allocated to a particular subclass are to be used, in the end, for the interests of the entire settlement class. We hold that the settlement agreement did not authorize the district court to make a charitable gift of the unused medical-monitoring funds and that the district court erred when it rejected the settlement administrator's request that the funds be reallocated to the members of Subclass A.

Our decision lies comfortably with prior decisions of this Court and our sister circuits,[28] which have necessarily taken case-specific approaches to the role of the federal district judge in the distribution of monies left unclaimed after administration of a class settlement. As we turn to the fit of the present case within the broader decisional line, we remind of the case's dimension. Here we treat a distinct category of such cases, in which funds have gone unused by a

---

[28] *E.g.*, *Masters*, 473 F.3d at 436 (holding that the district court abused its discretion by ordering a *cy pres* distribution where neither side contended that "each class member's recovery would be so small as to make an individual distribution economically impracticable").

No. 10-20305

particular subclass.[29]    Subclass B's failure to fully draw down the medical-monitoring fund did not constitute an abandonment or relinquishment by the class of its property interest in the settlement.[30]    The funds were unused by Subclass B, not unclaimed by the class as a whole.[31]    Proceeding from the premise that the settlement of damage claims in a class action both creates contractual obligations and defines property, we have emphasized the terms of the settlement agreement as approved by the district court.    That agreement preserved for the class something akin to a reversionary interest in funds unused by a particular subclass.    Where the terms of a settlement agreement are sufficiently clear, or, more accurately, insufficient to overcome the presumption that the settlement provides for further distribution to class members,[32] there is no occasion for charitable gifts, and *cy pres* must remain offstage.

---

[29] Thus, this is not a case where it was not feasible to make further distributions to any of the class members. *See, e.g.*, *In re Airline Ticket Comm'n Antitrust Litig.*, 268 F.3d 619, 621 (8th Cir. 2001); *Powell*, 119 F.3d at 706–07; *see also Masters*, *supra* note 15.    Nor does this case implicate the line of authority giving careful scrutiny to class settlement agreements in which the parties agree to a *cy pres* distribution. *See, e.g.*, *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 363 (3d Cir. 2010) (Weis, J., concurring in part and dissenting in part); *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d at 30–32, 34–36; *Six (6) Mexican Workers v. Az. Citrus Growers*, 904 F.2d 1301, 1304 & 1307 (9th Cir. 1990).

[30] *Accord In re Holocaust Victims Assets Litig.*, 424 F.3d 158, 166–69 (2d Cir. 2005) (affirming the district court's decision to reallocate settlement funds so as to directly benefit the neediest class members instead of making a *cy pres* distribution to charity).

[31] Put differently, while the funds were *allocated* to Subclass B, they *belonged* to the entire class.    It follows that there is no unclaimed or abandoned by property available to be claimed by the state or others via escheat or otherwise. *See generally All Plaintiffs v. All Defendants (In re Lease Oil Antitrust Litig.)*, 645 F.3d 329 (5th Cir. 2011).    On some golf courses there are signs reminding those who walk or jog the cart trails that a golf ball is not lost until it stops rolling.    This ball is still rolling.

[32] *See* ALI PRINCIPLES § 3.07(b).

15

### C.

Arkema pushes back with three counter-arguments.  None is sufficient to carry the day.   First, Arkema argues that paragraph 28 of the Protocol authorizes the district court to make changes to the terms of the Protocol, not the Agreement, and that it is the Agreement that fixes the amount of money to be allocated to each subclass.   It was the Agreement that made the initial allocation of money among the three subclasses. But it is paragraph 27 of the Protocol that controls the allocation of any monies remaining after the initial distribution.  In addition, Arkema's argument turns a blind eye to the language of paragraph 29, which expressly authorizes the district court, upon a request from the settlement administrator, to reallocate funds one subclass to another. Deciding to reallocate funds from the subclass with nuisance-exposure claims to the subclass with serious personal-injury claims was not beyond the scope of the authority that the Protocol conferred on the district court.

Next,  Arkema argues that the members of Subclass A have already been fully compensated because they were paid in full according to the terms of the Agreement.  Not so.  The fact that the members of Subclass A have received the payment authorized by the settlement agreement does not mean that they have been fully compensated.  As a general matter, "few settlements award 100 percent of a class member's losses, and thus it is unlikely in most cases that further distributions to class members would result in more than 100 percent recovery for those class members."[33]  Moreover, the Agreement does not even purport to provide full, individualized compensation.  It authorized pro rata distributions that were dictated by a formula that was designed to ensure, within the limits of the fund, that each claimant obtained some relief.  It valued each injury in relative terms, not absolute terms.

---

[33]  *Id.* § 3.07 cmt. b.

No. 10-20305

Finally, Arkema argues that equity weighs in favor of a *cy pres* distribution because distributing the unclaimed funds to members of Subclass A would deprive Subclass B of its settlement benefits. This argument is a straw man. All agree that additional distributions to the members of Subclass B were not economically viable. No proposal before the district court would have allowed Subclass B to receive the full value allocated to it by the original agreement. The choice was not between a distribution to Subclass A and a distribution to Subclass B; the choice was between a distribution to Subclass A and a distribution to charity. Although it is generally true that additional "distributions to class members better approximate the goals of the substantive laws than distributions to third parties that were not directly injured by the defendant's conduct,"[34] the district court had no need for that principle. The settlement agreement required the court to reallocate the funds among the subclasses of the class that generated the settlement fund.

## III.

The district court abused its discretion by ordering a *cy pres* distribution instead of distributing the unused medical-monitoring funds to the members of Subclass A. We reverse the district court's *cy pres* order and remand with instructions that the residual funds be distributed to the members of Subclass A consistently with the terms of the settlement agreement.

REVERSED and REMANDED.

---

[34] *Id.*

17

No. 10-20305

EDITH H. JONES, Chief Judge, concurring:

I concur in Judge Higginbotham's able opinion and in the conclusion that the invocation of *cy pres* here was an abuse of discretion remediable, under these particular facts, only by a pro rata distribution to subclass A. I write separately, however, to suggest that if the defendant had not waived its right to request a refund, it would have been entitled to the excess.

As Judge Higginbotham explains, the *cy pres* doctrine originated in the field of trust law "to save testamentary charitable gifts that would otherwise fail." *In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 682 (8th Cir. 2002). It has been imported into the class action context to distribute unclaimed funds "for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated." *Id.* at 682-83. It is inherently dubious to apply a doctrine associated with the voluntary distribution of a gift to the entirely unrelated context of a class action settlement, which a defendant no doubt agrees to as the lesser of various harms confronting it in litigation. *See* Martin H. Redish et al., *Cy Pres Relief & the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 Fla. L. Rev. 617, 621 (2010). *See also Mirfahisi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004) (Posner, J., describing *cy pres* in this connection as "badly misnamed.").

No. 10-20305

The opportunities for abuse have been repeatedly noted. *See, e.g.*, *Securities & Exchange Comm'n v. Bear, Stearns & Co., Inc.*, 626 F. Supp. 2d 402 (S.D.N.Y. 2009) ("While courts and the parties may act with the best intentions, the specter of judges and outside entities dealing in the distribution and solicitation of large sums of money creates an appearance of impropriety."). *See In re Pharm. Indust. Average Wholesale Price Liti..*, 588 F.3d 24 at 34 (1st Cir. 2009) (*cy pres* distributions are controversial); Adam Liptak, *Doling Out Other People's Money*, N.Y. Times Nov. 26, 2007, at A14 *available at* http://www.nytimes.com/2007/11/26/washington/26bar.html (describing particular distributions, "giving the money away to favorite charities with little or no relation to the underlying litigation is inappropriate and borders on distasteful);" Editorial, *When Judges Get Generous*, Wash. Post, Dec. 17, 2007, at A20, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/12/16/AR2007121601433.html; George G. Krueger & Judd A. Serotta, *Money For Nothing*, Legal Times, June 2, 2008; Sam Yospe, Note, *Cy Pres Distributions in Class Action Settlements*, 2009 Colum. Bus. L. Rev. 1014, 1027-41 (2009); Goutam U. Jois, *The Cy Pres Problem and the Role of Damages in Tort Law*, 16 Va. J. Soc. Pol'y & L. 258, 259 (2008). Whatever the superficial appeal of *cy pres* in the class action context may have been, the reality of the practice has undermined it. It is time for courts to rethink the justifications of the practice.

No. 10-20305

The panel opinion holds that the Rules Enabling Act places an "overarching limitation on class-action litigation" and demands "a narrow construction of Rule 23." Professor Redish has put the point more bluntly:

> Use of *cy pres* simultaneously violates the constitutional dictates of separation of powers by employing a Federal Rule of Civil Procedure to alter the compensatory enforcement mechanism dictated by the applicable substantive law being enforced in the class action proceeding. It has somehow become common practice among many courts, scholars, and members of the public to view the modern class action as a free-standing device, designed to do justice and police corporate evildoers. As nothing more than a Federal Rule of Civil Procedure, however, the class action device may do no more than enforce existing substantive law as promulgated either by Congress or, in diversity suits, by applicable state statutory or common law. Yet in no instance of which we are aware does the underlying substantive law sought to be enforced in a federal class action direct a violator to pay damages to an uninjured charity.

Redish et al., *supra*, at 623 (footnote omitted). *Cy pres* distributions arguably violate the Rules Enabling Act by using a wholly procedural device – the class-action mechanism as prescribed in Rule 23 – to transform substantive law "from a compensatory remedial structure to the equivalent of a civil fine." *Id.* They present an Article III problem by transforming "the judicial process from a bilateral private rights adjudicatory model into a trilateral process." *Id.* at 641. In addition, such distributions likely violate Article III's standing requirements. Courts should be troubled that a *cy pres* distribution to an outsider uninvolved in the original litigation may confer standing to intervene in the subsequent proceedings should the distribution somehow go awry.

No. 10-20305

Whether *cy pres* distributions violate the Constitution or Rules Enabling Act has not, to my knowledge, been fully litigated in any court,[1] and these questions are neither briefed nor presented for review here. Hence, I refrain from a more rigorous analysis and suggest instead that district courts should avoid the legal complications that assuredly arise when judges award surplus settlement funds to charities and civic organizations.

The preferable alternative, illustrated partially in *Wilson v. Southwest Airlines, Inc.*, 880 F.2d 807 (5th Cir. 1989), is to return any excess funds to the defendant.[2] The class action settlement fund in *Southwest Airlines* retained a balance of over $500,000 after all claimants had been reimbursed in full. *Id.* at 810. Claims were made against the balance by class counsel for additional claims administration fees and by Southwest for a return of the excess. *Id.* The district court rejected both claims and ordered a *cy pres* distribution to a local charity. Shortly thereafter, Southwest and class counsel entered a settlement that would divide the remaining funds between Southwest and the class counsel. *Id.* at 811. This court reversed the district court's judgment and approved the settlement. The opinion noted that Southwest "clearly renounced its legal claim to any residual funds" in the settlement agreement and therefore had no "legal

---

[1] At least one court has concluded that "fluid recovery" judgments – which differ materially from *cy pres* distributions – do not violate the Rules Enabling Act. *See Schwab v. Philip Morris USA, Inc.*, No. CV 04-1945, 2005 WL 3032556 (E.D.N.Y. Nov. 14, 2005).

[2] This approach, of course, was not available in today's case for reasons explained in the panel opinion.

21

right" to the balance. *Id.* at 812. Neither the plaintiffs nor counsel had a legal right to the balance either. As a result, this court ordered that the fund should be distributed to the party with the stronger equitable claim. *Id.* That party was the defendant:

> Southwest's equitable claim is premised on the fact that all the money in the fund originally belonged to it. Southwest turned over the money for the specific and limited purpose of compensating the class. It did so in the expectation that compensating the class would exhaust the fund. The record of the fairness hearing reveals that Southwest and class counsel both wrongly assumed that claims alone would amount to $900,000 or more of the fund, exclusive of expenses. Since Southwest turned over its money in the clear and reasonable expectation that the money was required for the specific purpose of compensating the class, its equitable claim to any money remaining after the accomplishment of that purpose is compelling.

*Id.* at 813.

In the ordinary case, to the extent that something must be done with unclaimed funds, the superior approach is to return leftover settlement funds to the defendant. This corrects the parties' mutual mistake as to the amount required to satisfy class members' claims. Other uses of the funds — a pro rata distribution to other class members, an escheat to the government, a bonus to class counsel, and a *cy pres* distribution — all result in charging the defendant an amount greater than the harm it bargained to settle. Our adversarial system should not effectuate transfers of funds from defendants beyond what they owe *to the parties* in judgments or settlements.