Partial Concurrence and Partial Dissent by Judge WALLACE
OPINION
McKEOWN, Circuit Judge;
Google’s free Internet search engine (“Google Search”) processes more than one billion user-generated search requests every day. This case arises from class action claims that Google violated users’ privacy by disclosing their Internet search terms to owners of third-party websites. We consider whether the district court abused its discretion in approving the $8.5 million cy pres-only settlement and conclude that it did not.
Background
In these consolidated class actions, three Google Search users — Paloma Gaos, Anthony Italiano, and Gabriel Priyev (collectively “plaintiffs”) — asserted claims for violation of the Stored Communications Act, *740 18 U.S.C. § 2701 et seq.-, breach of contract; breach of the covenant of good faith and fair dealing; breach of implied contract; and unjust enrichment. The plaintiffs sought statutory and punitive damages and declaratory and injunctive relief for the alleged privacy violations.
The claimed privacy violations are the consequence of the browser architecture. Once users submit search terms to Google Search, it returns a list of relevant websites in a new webpage, the “search results page.” Users can then visit any website listed in the search results page by clicking on the provided link.
When a user visits a website via Google Search, that website is allegedly privy to the search terms the user originally submitted to Google Search. This occurs because, for each search results page, Google Search generates a unique “Uniform Resource Locator” (“URL”) that includes the user’s search terms. In turn, every major desktop and mobile web browser (including Internet Explorer, Firefox, Chrome, and Safari) by default reports the URL of the last webpage that the user viewed before clicking on the link to the current page as part of “referrer header” information. See In re Zynga Privacy Litig., 750 F.3d 1098, 1102 (9th Cir. 2014) (explaining how “referrer headers” operate).[1]
The genesis of the plaintiffs’ complaints is the application of the search protocol, coupled with Google’s “Web History” service, which tracks and stores account holders’ browsing activity on Google’s servers. Following mediation, the parties reached a settlement, which they submitted to the district court for preliminary approval in July 2013. The settlement provided that Google would pay a total of $8.5 million and provide information on its website disclosing how users’ search terms are shared with third parties, in exchange for a release of the claims of the approximately 129 million people who used Google Search in the United States between October 25, 2006 and April 25, 2014 (the date the class was given notice of the settlement).
Of the $8.5 million settlement fund, approximately $3.2 million was set aside for attorneys’ fees, administration costs, and incentive payments to the named plaintiffs. The remaining $5.3 million or so was allocated to six cy pres recipients, each of which would receive anywhere from 15 to 21% of the money, provided that they agreed “to devote the funds to promote public awareness and education, and/or to support research, development, and initiatives, related to protecting privacy on the Internet.” The six recipients were AARP, Inc.; the Berkman Center for Internet and Society at Harvard University; Carnegie Mellon University; the Illinois Institute of Technology Chicago-Kent College of Law Center for Information, Society and Policy; the Stanford Center for Internet and Society; and the World Privacy Forum. Each of the recipients submitted a detailed proposal for how the funds would be used to promote Internet privacy.
After a hearing, the district court certified the class for settlement purposes and preliminarily approved the settlement. Notice was given to the class on April 25, 2014, via a wébsite, toll-free telephone number, paid banner ads, and press articles. Thirteen class members opted out of the settlement, and five class members, including Melissa Ann Holyoak and Theodore H. Frank (collectively “Objectors”), filed objections.
*741 Following a final settlement approval hearing at which the district court heard from both the parties and Objectors, the district court granted final approval of the settlement on March 31, 2015. With respect to the objections, the district court found that: (1) a cy pres- only settlement was appropriate because the settlement fund was non-distributable; (2) whether or not the settlement was cy pres- only had no bearing on whether Rule 23(b)(3)’s superiority requirement was met; (3) the cy pres recipients had a substantial nexus to the interests of the class members, and there was no evidence that the parties’ preexisting relationships with the recipients factored into the selection process; and (4) the attorneys’ fees were commensurate- with the benefit to the class. The district court awarded $2.125 million in fees to class counsel and $15,000 in incentive awards to the three named plaintiffs. Objectors appealed.
Analysis
The settlement at issue involves a cy pres-only distribution of the $5.3 million or so that remains in the settlement fund after attorneys’ fees, administration costs, and incentive awards for the named plaintiffs are accounted’ for Cypres, which takes its name from the Norman French expression cy pres comme possible (or “as near as possible”), is an equitable doctrine that originated in trusts and estates law as a way to effectuate the testator’s intent in making charitable gifts. Nachshin v. AOL, LLC, 663 F.3d 1034, 1038 (9th Cir. 2011). In the class action settlement context, the cy pres doctrine permits a court to distribute unclaimed or non-distributable portions of a class action settlement fund to the “next best” class of beneficiaries for the indirect benefit of the , class. Id.
Here, the cy pres recipients were six organizations that have pledged to use the settlement funds to promote the protection of Internet privacy. We review for abuse of discretion the district court’s approval of the proposed class action settlement. Id. In addition, because the settlement took place before formal class certification, settlement approval requires a “higher standard of fairness.” Lane v. Facebook, Inc., 696 F.3d 811, 819 (9th Cir. 2012) (quoting Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998)), cert. denied. sub nom. Marek v. Lane, — U.S. —, 134 S.Ct. 8, 187 L.Ed.2d 392 (2013). Recognizing that, at this early stage of litigation, the district court cannot as effectively monitor for collusion and other abuses, we scrutinize the proceedings to discern whether the court sufficiently “accounted] for the possibility that class representatives and 'their counsel have sacrificed the interests of absent class members for their own benefit.” Id.
I. Appropriateness of the Cy Pres-Only Settlement '
As an initial matter, we quickly dispose of the argument that the district court erred by approving a cy pres-only settlement. Notably, Objectors do not contest the value of the settlement nor do they plead monetary injury. To be sure, cy pres-only settlements are considered the exception, not the rule. See Klier v. Elf Atochem N. Am., Inc., 658 F.3d 468, 474 (5th Cir. 2011) (explaining that direct distributions to class members are preferable because “[t]he settlement-fund proceeds, having been generated by the value, of the class members’ claims,” are “the property of the class”); accord William B. Rubenstein, Newberg on Class Actions § 12:26 (5th ed. 2017). However, they are appropriate where the settlement fund is “non-distributable” because “the proof of individual claims would be burdensome or distribution of damagés costly.” Lane, 696 *742 F.3d at 819 (quoting Nachshin, 663 F.3d at 1038). We have never imposed a categorical ban on a settlement that does not include direct payments to class members.
The district court’s finding that the settlement fund was non-distributable accords with our precedent. In Lane, we deemed direct monetary payments “infeasible” where each class member’s individual recovery would have been “de minimis” because the remaining settlement fund was approximately $6.5 million and there were over 3.6 million class members. Id. at 817-18, 820-21. The gap between the fimd and a miniscule award is even more dramatic here. The remaining settlement fund was approximately $5.3 million, but there were an estimated 129 million class members, so each class member was entitled to a paltry 4 cents in recovery — a de minimis amount if ever there was one. The district court found that the cost of verifying and “sending out very small payments to millions of class members would exceed the total monetary benefit obtained by the class.”
To begin, the district court found that the amount of the fund was appropriate given the shakiness of the plaintiffs’ claims. Objectors do not contend that it would have been feasible to make a 4-cent distribution to every class member. Instead, they ask us to impose a mechanism that would permit a miniscule portion of the class to receive direct payments, eschewing a class settlement that benefits members through programs on privacy and data protection instituted by the cy pres recipients. Objectors suggest, for example, that “it is possible to compensate an oversized class with a small settlement fund by random lottery distribution,” or by offering “$5 to $10 per claimant” on the assumption that few class members will make claims. Our review of the district court’s settlement approval is not predicated simply on whether there may be “possible” alternatives; rather, we benchmark whether the district court discharged its obligation to assure that the settlement is “fair, adequate, and free from collusion.” Lane, 696 F.3d at 819 (quoting Hanlon, 150 F.3d at 1027). If we took their objections at face value, Objectors would have us jettison the teachings of Lam. Objectors would also have us ignore our prior endorsement of cy pres awards that go to uses consistent with the nature of the underlying action. Nachshin, 663 F.3d at 1039-40.[2]
Likewise, we easily reject Objectors’ argument that if the settlement fund was non-distributable, then a class action cannot be the superior means of adjudicating this controversy under Rule 23(b)(3). “[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy.” Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) (alteration in original) (quoting 7AA Charles Alan Wright et al., Federal Practice and Procedure § 1779 (3d ed. 2005)). Not surprisingly, there is a relationship between the superiority requirement and the appropriateness of a cy pres-only settlement. The two concepts are not mutually exclusive, since “[w]here recovery on an individ *743 ual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification.” Id. The district court did not abuse its discretion in finding the superiority requirement was met because the litigation would otherwise be economically infeasible. This finding dovetails with the rationale for the cypres only settlement.[3]
II. The Cy Pres Recipients
We now turn to the crux of this appeal: whether approval of the settlement was an abuse of discretion due to claimed relationships between counsel or the parties and some of the cy pres recipients. We have long recognized that the cy pres doctrine, when “unbridled by a driving nexus between the plaintiff class and the cy pres beneficiaries[,] poses many nascent dangers to the fairness of the distribution process,” because the selection process may then “answer to the whims and self interests of the parties, their counsel, or the court.” Nachshin, 663 F.3d at 1038-39; see also Dennis v. Kellogg Co., 697 F.3d 858, 865 (9th Cir. 2012); Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1308-39 (9th Cir. 1990). Due to these dangers, we require cy pres awards to meet a “nexus” requirement by being tethered to the objectives of the underlying statute and the interests of the silent class members. Nachshin, 663 F.3d at 1039.
Objectors suggest that the district court rubber-stamped the settlement, by “simply h[olding] that the Ninth Circuit and district courts have approved other all — eg/— pres settlements and class members effectively had no right to complain about the parties’ choice of compromise.” That characterization is unfair and untrue. And oddly, despite this claim, Objectors do not dispute that the nexus requirement is satisfied here.
The district court found that the six cy pres recipients are “established organizations,” that they were selected because they are “independent,” have a nationwide reach and “a record of promoting privacy protection on the Internet,” and “are capable of using the funds to educate the class about online privacy risks.” Although the district court expressed some disappointment that the recipients were the “usual suspects,” it recognized that “failure to diversify the list of distributees is not a basis to reject the settlement ... when the proposed recipients otherwise qualify under the applicable standard.” Accordingly, the district court appropriately found that the cy pres distribution addressed the objectives of the Stored Communications Act and furthered the interests of the class members. Previous cy pres distributions rest on this same understanding of the nexus requirement. See, e.g., Dennis, 697 F.3d at 866-67 (no nexus between false advertising claims relating to the nutritionr al value of Frosted Mini-Wheats® and charities providing food for the indigent); Lane, 696 F.3d at 817, 820-22 (nexus between Facebook privacy claims and charity giving grants promoting online privacy and security); Nachshin, 663 F.3d at 1039-41 (no nexus between breach of privacy, un *744 just enrichment, and breach of contract claims relating to AOL’s provision of commercial e-mail services and the Legal Aid Foundation of Los Angeles, the Boys and Girls Clubs of Santa Monica and Los Angeles, and the Federal Judicial Center Foundation); Six (6) Mexican Workers, 904 F.2d at 1307-09 (no nexus between Farm Labor Contractor Registration Act claims and foundation operating human assistance projects in areas where plaintiffs resided).
Nonetheless, Objectors take issue with the choice of cy pres .recipients, because Google has in the past donated to at least some of the cy pres recipients, three of the cy pres recipients previously received Google settlement funds, and three of the cy pres recipients are organizations housed at class counsel’s alma maters. See In re Google Buzz Privacy Litig., No. C 10-00672 JW, 2011 WL 7460099, at *3 (N.D. Cal. Jun. 2, 2011). The Objectors point to a comment from the American Law Institute’s (“ALI”) Principles of the Law. of Aggregate Litigation which suggests that “[a] cy pres remedy should not be ordered if the court or any party has any significant prior affiliation with the intended recipient that would raise substantial questions about whether the selection of the recipient was made on the merits.” Principles of the Law of Aggregate Litig. § 3.07 cmt. b (Am. Law Inst. 2010) (emphasis added).[4]
The benchmark for “significant prior affiliation” is left undefined. Id, Of course it makes' sense that the district court should examine any claimed relationship between the cy pres recipient and the parties or their counsel. But a prior relationship or connection between the two, without more, is not an absolute disqualifler. Rather, a number of factors, such as the nature of the relationship, the timing and recency of the relationship, the significance of dealings between the recipient and the party or counsel, the circumstances of the selection process, and the merits of the recipient play into the analysis. The district court explicitly or implicitly addressed this range of considerations,
We do not need to explore the contours of the “significant prior affiliation” comment because in the' context of this settlement, the claimed relationships do not “raise substantial questions about whether the selection of the recipient was made on the merits.” See id. § 3.07 cmt. b.[5] As a starting premise, Google’s role as a party in reviewing the cy pres recipients does not cast doubt on the settlement. In Lane, we approved a cy pres-only settlement in which the distributor of the settlement fund was a newly-created entity run by a three-member board of directors, one of whom was defendant Facebook’s Director of Public Policy. 696 F.3d at 817. We rejected the claim that this structure created an “unacceptable conflict of interest,” explaining that “[w]e do not require .., that settling parties select a cy pres recipient that the court or class members would find ideal” since “such an intrusion into the private parties’ negotiations would be improper and disruptive to the settlement process.” Id. at 820-21, Instead, we *745 recognized that, as the “ ‘offspring of compromise,’” settlement agreements “necessarily reflect the interests of both parties to the settlement.” Id. at 821 (quoting Hanlon, 150 F.3d at 1027). Thus, we concluded that Facebook’s ability to have “its say” in the distribution of cy pres funds was “the unremarkable result of the parties’ give-and-take negotiations” and acceptable so long as the nexus requirement was satisfied. Id. at 821-22.
Given the burgeoning importance of Internet privacy, it is no surprise that Google has chosen to support the programs and research of recognized academic institutes and nonprofit organizations. Google has donated to hundreds of third-party organizations whose work implicates technology and Internet policy issues, including university research centers, think tanks, advocacy groups, and trade organizations.[6] These earlier donations do not undermine the selection process employed to vet the cy pres recipients in this litigation. The district court conducted a “careful ] review” of the recipient’s “detailed proposals” and found a “substantial nexus” between the recipients and the interests of the class members. Notably, some of the recipient organizations have challenged Google’s Internet privacy policies in the past.[7] Most importantly, there was transpareney in this process, with the proposed recipients disclosing donations received from Google. Each recipient’s ay pres proposal identified the scope of Google’s previous contributions to that organization, and, unlike in Lane, explained how. the cy pres funds were distinct from Google’s general donations. See Dennis, 697 F.3d at 867-68 (casting doubt on the value of cy pres ‘funds that a defendant “has already obligated itself to donate”). Citing Lane, the district court found that “[t]he chosen recipients and their respective proposals are sufficiently related so as to warrant approval; they do not have to be the recipients that objectors or the court consider ideal.”
The objection that three of the cy pres recipients had previously received cy pres funds from Google does not impugn the settlement without something more, such as fraud or collusion. See Rodriguez v. W. Publ’g Corp., 563 F.3d 948, 965 (9th Cir. 2009). That “something more” is missing here; Indeed, the proposition that cy pres funds should not be awarded to previous recipients would be in some tension with our nexus requirements. As we have recognized, it is often beneficial for a cy pres recipient to have a “ ‘substantial record of service,’ ” because such a record inspires *746 confidence that the recipient will use the funds to the benefit of class members. See Dennis, 697 F.3d at 865 (quoting Six (6) Mexican Workers, 904 F.2d at 1308); Lane, 696 F.3d at 822. But in emerging areas such as Internet and data privacy, expertise in the subject matter may limit the universe of qualified organizations that can meet the strong nexus requirements we impose upon cy pres recipients. Given that, over time, major players such as Google may be involved in more than one cy pres settlement, it is not an abuse of discretion for a court to bless a strong nexus between the cy pres recipient and the interests of the class over a desire to diversify the pick via novel beneficiaries that are less relevant or less qualified. See Nachshin, 663 F.3d at 1040 (considering whether the cy pres distribution “provide[s] reasonable certainty that any member will be benefitted”).
Finally, we reject the proposition that the link between the cy pres recipients and class counsel’s alma maters raises a significant question about whether the recipients were selected on the merits. There may be occasions where the nature of the alumni connections between the parties and the recipients could cast doubt on the propriety of the selection process. But here, we have nothing more than a bare-bones allegation that class counsel graduated from schools that house the Internet research centers that will receive funds.
The claim that counsel’s receipt of a degree from one of these schools taints the settlement can’t be entertained with a straight face. Each of these schools graduates thousands of students each year. Objectors have never disputed that class counsel have no ongoing or recent relationships with their alma maters and have no affiliations with the specific research centers. Nor did the district court simply accept this concession or put the burden on the Objectors. The district court appropriately considered the substance of the objections and explained why those challenges did not undermine the overall fairness of the settlement. See In re Pac. Enters. Sec. Litig., 47 F.3d 373, 377 (9th Cir. 1995). The court affirmatively analyzed the issue and was cognizant of the claim of a potential conflict. All class counsel swore that they have no affiliations with the specific research centers. Class counsel repeated that attestation at the final settlement approval hearing and added that they sit on no boards for any of the proposed recipients. As one class counsel put it, “I simply got my law degree [at Harvard], and that’s simply the end of it.”[8] The recipients are well-recognized centers focusing on the Internet and data privacy, and the district court conducted a “careful[] review” of the recipients’ “detailed proposals” and found a “substantial nexus” between the recipients and the interests of the class members.[9] No one suggested that any of the centers *747 acted -with any impropriety, and the Objectors provided no alternative suggestions for other law schools with more qualified centers or institutes. The district court found “no indication that counsel’s allegiance to a particular alma mater factored into the selection process,” particularly since the identity of the recipients “was a negotiated term included in the Settlement Agreement and therefore not chosen solely by .., alumni.” Thus, the district court gave a “sufficient[ly] reasoned” response to the objections as to the claimed preexisting relationships. In re Pac. Enters. Sec. Litig., 47 F.3d at 377. We can hardly say that the alumni connections cloud the fairness of the settlement.
As an overarching matter, nothing in this record “raise[s] substantial questions about whether the selection of the recipient was made on the merits.” See Principles of the Law of Aggregate Litig. § 3.07 cmt. b. We do not suggest, however, that a party’s prior relationship with a cy pres recipient could not be a stumbling block to approval of a settlement. Cf. Marek, 134 S.Ct. at 9 (mem.) (statement of Roberts, C.J., respecting the denial of certiorari) (recognizing that given the “fundamental concerns surrounding” cy pres awards and their increasing prevalence, the Court “may need to clarify the limits on the use of such remedies” in the future). We hold merely that, under the circumstances here, the district court did not abuse its discretion in approving the cy pres recipients.
III. Attorneys’ Fees
Turning to the issue of attorneys’ fees, the district court did not abuse its discretion by approving $2.125 million in fees and $21,643.16 in costs. As an initial matter, there is no support for Objectors’ view that the settlement should have been valued at a lower amount for the purposes of calculating attorneys’ fees simply because it was cy pres-only. See generally Lane, 696 F.3d at 818 (acknowledging a 25% fee award that also involved a cy pres-only settlement). Rather, the question is whether the amount of attorneys’ fees was reasonable. In re Bluetooth Headset Prod. Liab. Litig., 654 F.3d 935, 941 (9th Cir. 2011).
In a settlement that produces a common fund for the benefit of the entire class, a court has discretion to employ either the “percentage-of-recovery” method or the “lodestar” method to calculate appropriate attorneys’ fees, so long as its discretion is exercised so as to achieve a reasonable result. See id. at 942. Here, the district court found that the requested fees were appropriate under either metric.
Under the percentage-of-recovery method, the requested fee was equal to 25% of the settlement fund. According to the district court, this percentage was commensurate with the risk posed by the action and the time and skill required to secure a successful result for the class, given that class counsel faced three motions to dismiss and participated in extensive settlement negotiations. The district court also found that this percentage hewed closely to that awarded in similar *748 Internet privacy actions. See, e.g., In re Netflix Privacy Litig., No. 5:11-CV-00379 EJD, 2013 WL 1120801, at *9-10 (N.D. Cal. Mar. 18, 2013); see also In re Bluetooth, 654 F.3d at 942 (noting that 25% is our “benchmark” for a reasonable fee award).
Although not required to do so, the district court took an extra step, cross-checking this result by using the lodestar method. See In re Bluetooth, 654 F.3d at 941-44 (checking the district court’s percentage-of-recovery fees calculation against the lodestar method, which is “calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation ... by a reasonable hourly rate for the region and the experience of the lawyer”). The district court found that class counsel provided sufficient support for its lodestar calculation that fees totaled $2,126,517.25.
AFFIRMED.

. For instance, if a user enters “2016 presidential election” into Google Search and clicks on a link to www.cnn.com/election on the search results page, the "referrer header” would tell CNN that the user found her way there via "http://www.google,com/scarch?q= 2016+presidential+election. ’'

. It bears noting, of course, that district courts are not precluded from approving other distribution methods that might benefit the class more directly under certain circumstances. However, the fact that there are other conceivable methods of distribution does not mean that the district court abused its discretion by declining to adopt them. See Kode v. Carlson, 596 F.3d 608, 612 (9th Cir. 2010) (per curiam) (holding that "[t]he abuse of discretion standard requires us to uphold a district court determination that falls within a broad range of permissible conclusions”).

. Objectors point to In re Hotel Tel. Charges, 500 F.2d 86, 91 (9th Cir. 1974), as an example of a case where we found the superiority requirement not met because “the principal, if not the only, beneficiaries to the class action are to be the attorneys for the plaintiffs and not the individual class members.” But In re Hotel did not involve a cy pres distribution or even a settlement. See id. Instead, we held that a class action was not the superior means of resolving the controversy because the class members' antitrust claims involved a “great variety” of individualized determinations. Id. at 90-91; see also Six (6) Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1305-06 (9th Cir. 1990) (distinguishing In re Hotel on the basis that the case raised concerns regarding "individual proof of damages”).

. This statement is found in a comment that is . unsupported by any illustration, case law, or other authority. Id. § 3.07 cmt. b.

. Other circuits have-endorsed § 3,07’s preference for direct distribution to class members over the use of cy pres awards where practicable, See In re BankAmerica Corp. Sec. Litig., 775 F.3d 1060, 1064-65 (8th Cir. 2015); Klier, 658 F.3d at 475 n.16. And though we have not adopted § 3.07, we too have expressed a similar preference. See Nachshin, 663 F.3d at 1036. However, no circuit has.yet adopted § 3.07 comment b’s "significant prior affiliation” reference.

. See Transparency — U.S. Public Policy — Google, Google.com, https://www.google.com/ publicpolicy/transparency.html (last visited July 21, 2017) (listing third-party organizations Google has supported in the past).

. At least one of the recipients, World Privacy Forum, has publicly criticized Google’s lack of transparency regarding its privacy policies. See Joseph Menn, Privacy Advocates Target Google, L.A. Times (June 4, 2008), http:// articles.latimes.com/2008/jun/04/business/fi-google4. And a complaint filed by the World Privacy Forum and a Stanford Center for Internet and Society study played a key role in the $17 million fine Google paid to the Federal Trade Commission for circumventing user’s privacy choices in Apple’s Safari Internet browser. See Kukil. Bora, FTC Appears Ready to Fine Google Millions Over Apple Safari Privacy Breach, Int’l Bus. Times (May 5, 2012), http://www.ibtimes.com/ftc-appears-ready-fine-google-millions-over-apple-safari-privacy-breach-report-696537; Claire Cain Miller, Google to Pay $17 Million to Settle Privacy Case, N.Y. Times (Nov, 18, 2013), http://www.nytimes.com/2013/l 1/19/ technology/google-to-pay-17-million-to-settle-privacy-case.html; Elinor Mills, Privacy Brouhaha Reveals Google's Split Personality, CNET (Feb. 17, 2012), http://www.cnet.com/nows/ privacy-brouhaha-reveals-googles-split-personality/. Both organizations are cy pres recipients here.

. The dissent's suggestion that what is needed is a hearing with sworn testimony seems superfluous in view of the extensive hearing held by the district court, the specific queries to counsel about the cy pres recipients, and the submission of sworn declarations.

. The dissent challenges the inclusion of the Chicago-Kent College of Law Center for Information, Society and Policy (“CISP”) as a recipient, noting that the center was only inaugurated in 2012. See Chicago-Kent Mag., Summer 2012, at 8, available at https://issuu. com/chicagokentlaw/docs/chicago-kent-magazine-2012. This judicial second-guessing does not bear scrutiny, particularly in a field that is developing quickly and where the record reveals a different story. CISP’s cy pres proposal, which outlines a “privacy preparedness” project that would develop interactive materials to educate the public about ways to protect their Internet and data privacy, notes that the five faculty involved in the proposed project are respected leaders in the field of Internet and privacy law, that CISP has received other cy pres awards and grants, and *747 that CISP has hosted five conferences on Internet and data privacy issues that have attracted hundreds of attendees and trained over a hundred journalists on data privacy. In addition, CISP conducts research in such areas as data aggregation, social networks and health information, and children and internet privacy; engages in policy advocacy, community outreach, and public education; and holds seminars on Internet and data privacy issues for law students, See Center for Information, Society and Policy, Kentlaw.iit.edu, https://www.kentlaw.iit.edu/institutes-centers/ center-for-information-society-and-policy (last visited July 24, 2017),