O'Brien v Sagbolt LLC (2025 NY Slip Op 05280)

O'Brien v Sagbolt LLC

2025 NY Slip Op 05280

Decided on October 2, 2025

Appellate Division, Third Department

Fisher, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:October 2, 2025

CV-24-0735

[*1]Evelyn O'Brien et al., on Behalf of Themselves and All Others Similarly Situated, Respondents,
v
Sagbolt LLC et al., Appellants.

Calendar Date:August 14, 2025

Before: Lynch, J.P., Ceresia, Fisher, Powers and Mackey, JJ.

Greenberg Traurig, LLP, Albany (Henry M. Greenberg of counsel), for appellants.
Chaudhuri Law, PLLC, New York City (Ananda N. Chaudhuri of counsel) and Fleischman Bonner & Rocco LLP, White Plains (Keith M. Fleischman of counsel) and Law Office of Joseph T. Moen, Saratoga Springs (Joseph T. Moen of counsel), for respondents.

Fisher, J.
Appeal from an order of the Supreme Court (Martin Auffredou, J.), entered March 25, 2024 in Warren County, which granted plaintiffs' motion to, among other things, enforce a class action settlement.
In 2018, plaintiffs commenced a class action alleging violations of the Labor Law for unpaid tips since 2012, on behalf of all hourly waitstaff employees who worked catered events at The Sagamore, a resort and hotel owned and operated by defendants in the Town of Bolton, Warren County. Following certification of the class and four years of disclosure, the parties entered into a settlement agreement whereby defendants agreed "to make a total financial obligation" of $1.2 million toward class counsel's fees and costs, service payments to the named plaintiffs, expenses to the claims administrator and settlement payments to authorized class members. Supreme Court granted plaintiffs' motion for preliminary approval of the settlement and, after holding a fair hearing, granted plaintiffs' motion for final approval (see CPLR 908).
Thereafter, a dispute arose between the parties regarding who was supposed to prepare the various settlement checks and how to handle the unclaimed funds from uncashed checks sent to the authorized class members. This prompted plaintiffs to move to enforce the settlement agreement and require defendants to pay into a settlement fund allegedly contemplated by the approved agreement, so that the claims administrator could redistribute the remaining money from uncashed checks back to the authorized class members. Defendants submitted opposition, contending that the settlement agreement did not require them to establish a settlement fund, but even if it did, they complied with the terms of the agreement by placing money into a settlement fund for the claims administrator to distribute payments to class counsel and the named plaintiffs, and then separately provided settlement checks for the claims administrator to send to authorized class members. Defendants further contended that the agreement did not provide for a redistribution, therefore any unclaimed funds should revert to them. Supreme Court found that the settlement agreement required defendants to deliver the $1.2 million into a settlement fund and, although the agreement was silent regarding how to handle the unclaimed funds, that redistribution was consistent with the terms of the agreement requiring a pro rata distribution of remaining settlement funds to the authorized class members. As a result, Supreme Court determined that defendants breached the contract and their covenant of good faith and fair dealing, and granted plaintiffs' motion. Defendants appeal.
Class action settlement agreements and "releases are contracts to be interpreted in accordance with principles of contract law," and therefore carry "a heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties" (Marcella v Glowacki, 233 AD3d 1137, 1139-1140[*2][3d Dept 2024] [internal quotation marks and citations omitted]). In interpreting "a contract, particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties manifested thereby" (Kolbe v Tibbetts, 22 NY3d 344, 353 [2013] [internal quotation marks, brackets and citation omitted]). Reviewing "courts must compare the competing interpretations advanced by the parties to the contractual language, which represents the best evidence of the parties' intent" (Hogan v Bullock, 233 AD3d 1321, 1324 [3d Dept 2024] [internal quotation marks and citations omitted]). In doing so, "a contract must be construed in a manner which gives effect to each and every part, so as not to render any provision meaningless or without force or effect" (Ali-Hasan v St. Peter's Health Partners Med. Assoc., P.C., 226 AD3d 1199, 1202 [3d Dept 2024] [internal quotation marks and citations omitted], lv denied 42 NY3d 906 [2024]). Unless there is an ambiguity, extrinsic evidence beyond "the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing" (W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162 [1990]). Such an ambiguity is not created by a contract's silence on an issue, nor does one "arise[ ] out of what was not written at all, but only out of what was written so blindly and imperfectly that its meaning is doubtful" (Donohue v Cuomo, 38 NY3d 1, 13 [2022] [internal quotation marks and citations omitted]). Therefore, a settlement agreement "that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (Ampower-US, LLC v WEG Transformers USA, LLC, 214 AD3d 1129, 1131 [3d Dept 2023] [internal quotation marks and citations omitted]).
As relevant here, the parties agreed to resolve the litigation for a "Gross Settlement Sum" (hereinafter GSS) of $1.2 million, representing the "maximum" amount that defendants would fund under the settlement agreement. Payments made to class counsel for fees and costs, the claims administrator and the named plaintiffs would be deducted from the GSS. The remaining balance became the "Net Settlement Sum" (hereinafter NSS), and each authorized class member would receive a pro rata share of the NSS based on a specified formula using their hours worked during the relevant period. Notably, given the nature of a class action (see CPLR 908), the payments to class counsel and the named plaintiffs contemplated by the settlement agreement out of the GSS had to be approved by Supreme Court. However, if the court awarded less than the amount agreed to by the parties, such "corresponding reduction shall serve to reduce the Qualified Settlement Fund, and in no event will be added to the portion of the Qualified Settlement Fund to be remitted to" authorized class members.[FN1] The agreement defined the "Qualified Settlement Fund" (hereinafter QSF) as "[*3]the account established and controlled by the [c]laims [a]dministrator for the purposes of retaining and distributing the Final Settlement Amount in accordance with" the agreement. The term "Final Settlement Amount" is not defined by the contract. Upon the effective date of the agreement, the claims administrator "shall distribute" the payments to class counsel, the named plaintiffs and the authorized class members. Defendants also had the option to distribute funds to the same individuals, including the authorized class members. Each party was responsible for their own tax consequences, and the agreement specified that the "[e]mployer payroll taxes shall be paid by [d]efendants in addition to any claimed amount in the [GSS]."
Here, both parties acknowledge deficiencies in the terms of the settlement agreement, notably undefined terms. Nonetheless, defendants contend that they complied with the terms of the settlement agreement because they were not required to establish a settlement fund. Although we can agree with defendants that the agreement is unclear as to the extent of what is included in the QSF due to the undefined term of "Final Settlement Amount," adopting defendants' interpretation would render significant portions of the agreement meaningless and ignore the fact that they did pay into a settlement fund for certain awards as part of this class action settlement. In our view, this undefined term simply corresponds with the total amount that defendants are obligated to contribute toward resolving this class action after preliminary and final approval by Supreme Court. We reach this conclusion by recognizing that, although the parties agreed to a GSS of $1.2 million, all settlements in a class action must be approved by a court (see CPLR 908), which is obligated to approve the notice to the class (see CPLR 904) and payments to class counsel and the named plaintiffs (see CPLR 909). Although defendants agreed to not contest these awards on plaintiffs' motion for preliminary and final approval, what Supreme Court would do during the approval process created a variable that could alter the final settlement amount that the parties agreed would resolve this class action. The parties recognized this, and created clauses stating that any reduction by Supreme Court to the payment earmarked for class counsel or the named plaintiffs would reduce the QSF and shall not be added to the portion of the QSF which was to be remitted to authorized class members. Had there been no intention by the parties to form a settlement fund, the parties would have had no need to create such a provision reducing the QSF that was to be retained and controlled by the claims administrator, but rather they would have created a provision reducing the GSS — which was inclusive of all payments to be made by defendants. To hold otherwise would equate the QSF and GSS as the same, rendering one of those terms meaningless (see Ali-Hasan v St. Peter's Health Partners Med. Assoc., [*4]P.C., 226 AD3d at 1202), which the balance of the agreement simply does not do.
Defendants counter that the interpretation requiring them to deposit the $1.2 million into a settlement fund controlled by the claims administrator would create two tax problems. First, defendants contend that the agreement provides that any settlement payment claimed by an authorized class member would result in defendants issuing such recipient an IRS Form W-2, but that defendants could not do so if they were not the entity issuing the settlement payments. As Supreme Court found, defendants have offered no statutory or regulatory provision to support this contention, and our research has only revealed the contrary (see 26 USC § 3504 [permitting third-party agents to pay wages of employees and perform other acts required of employers, who remain able and liable to do such acts on their own accord]; 26 CFR 31.3504-1 [a]; see also US Internal Revenue Service Internal Revenue Manual § 5.1.24.4.4.1 [updated Mar. 24, 2025], available at https://www.irs.gov/irm/part5/irm_05-001-024r#idm140254540831552 [acknowledging, where a third-party agent paid wages to employees on behalf of an employer, such agent may also furnish IRS Form W-2s to such employees on behalf of the employer]). Further to this point, it is not unnoticed that defendants have not claimed a similar hurdle in issuing the IRS Form 1099s to the named plaintiffs for their services awards — despite the fact that defendants did not issue these payments to them, but rather deposited a sum of money for the claims administrator to split and disburse. Second, defendants contend that, for the claims administrator to issue checks directly to the authorized class members, defendants were required to fund an extra $87,000 to account for the employer's share of taxes, for a total of $1,287,000. Although it is true that the settlement agreement provided that defendants agreed to make a "total financial obligation in the maximum amount" of $1.2 million toward the GSS, that is a misnomer, as the agreement also clearly provided that defendants were responsible for employer payroll taxes in addition to the GSS.[FN2] Based on the foregoing and our review of the balance of those terms, although the settlement agreement may be less than perfect due to undefined terms, we are satisfied that the express terms of the agreement read together as a whole manifest an intent by the parties to create a settlement fund to be retained and controlled by the claims administrator (see Hogan v Bullock, 233 AD3d at 1327; Erie Blvd. Hydropower, L.P. v State of New York, 113 AD3d 906, 908 [3d Dept 2014]).
That does not, however, end our inquiry. Defendants also contend that, if they were required to pay into a settlement fund, they nevertheless complied with the terms of the agreement when they 1) deposited a sum of money with the claims administrator to distribute to class counsel and the named plaintiffs, and 2) provided the claims administrator with [*5]settlement checks to distribute to the authorized class members. We find such contention to have merit. Although the settlement agreement carefully defines the QSF and outlines certain obligations for the claims administrator relating to the payment of the "Final Settlement Amount," it does so subject to the other terms of the agreement. This would include the terms of paragraph 81, which acknowledges that defendants have the option to distribute funds to the authorized class members. Even though this is also subject to the other terms of the agreement, as well as the preliminary and final approval orders, there are no provisions or language contained therein which prohibit this arrangement. Plaintiffs' contention that paragraph 81 is merely a recitation of the representations by counsel, and therefore does not confer any authority to defendants to distribute funds to the authorized class members, does not support their position either. Rather, it recognizes that the parties acknowledge and plaintiffs' counsel "warrant and represent" that the settlement agreement — which is less than perfect and contains undefined terms — does permit defendants the ability to distribute funds in this manner. Thus, adopting plaintiffs' interpretation would render their affirmative representations under paragraph 81 meaningless — if not outright false. In contrast, by depositing a portion of the GSS with the claims administrator to distribute to class counsel and the named plaintiffs, while also providing pre-written settlement checks to the authorized class members, defendants have given meaning to the terms of the agreement that authorized both the claims administrator and defendants to "distribute funds." As such, we cannot say that defendants breached terms of the settlement agreement when they did so, and therefore Supreme Court erred when it made such determination.
Next, we turn to the issue of unclaimed funds. In addition to the principles of contract, we must recognize the underlying reason why CPLR 908 requires the court to approve any settlement of a class action. Indeed, such necessity reflects the equitable origins of class actions (see Friar v Vanguard Holding Corp., 125 AD2d 444, 446 [2d Dept 1986]), whereby "trial court[s] must act as the protector of the rights of the absent class members" (Klein v Robert's Am. Gourmet Food, Inc., 28 AD3d 63, 70 [2d Dept 2006] [internal quotation marks and citation omitted]). In enacting article 9 of the CPLR, which was modeled on Federal Rules of Civil Procedure rule 23 (see Governor's Approval Mem at 1, Bill Jacket, L 1975, ch 207), the Legislature expressly recognized that courts maintain a "special role and responsibilit[y] in class actions" (Assembly Mem in Support at 3, Bill Jacket, L 1975, ch 207), and conferred broad and flexible powers to courts to "make appropriate orders" carrying out such a supervisory role (CPLR 907); state courts have turned to federal case law for guidance in carrying out these functions[*6](see Desrosiers v Perry Ellis Menswear, LLC, 30 NY3d 488, 495 [2017]; Matter of Colt Indus. Shareholder Litig., 155 AD2d 154, 160 [1st Dept 1990], mod on other grounds 77 NY2d 185 [1991]; Avena v Ford Motor Co., 85 AD2d 149, 151-152 [1st Dept 1982]).
As it specifically relates to unclaimed funds, courts have broad discretionary powers in shaping equitable decrees for distributing unclaimed class action funds (see Van Gemert v Boeing Co., 739 F2d 730, 737 [2d Cir 1984]). Such supervisory powers extend beyond the consummation of a settlement agreement, where federal and state courts still possess a duty to exercise their broad powers over the administration of class action settlements, including to reallocate settlement proceeds amongst class members to ensure a more equitable allocation (see Beecher v Able, 575 F2d 1010, 1016 [2d Cir 1978]), or to control a distribution not provided for in an agreement (see Friar v Vanguard Holding Corp., 125 AD2d at 446 [rejecting notion of reverting unclaimed funds to a defendant]). In considering a procedure for distributing unclaimed settlement funds, a court's alternatives will generally include 1) reversion to the defendant, 2) pro rata redistribution to the class members who filed/accepted claims, 3) escheat to a government entity, or 4) a cy press or fluid distribution, usually to a charity whose goals are consistent with the underlying causes of action (see 4 Newberg & Rubenstein on Class Actions § 12:28 [6th ed, June 2025 update]; see also Arkansas Teacher Retirement Sys. v State St. Corp., 25 F4th 55, 61 n1 [1st Cir 2022]; Six [6] Mexican Workers v Arizona Citrus Growers, 904 F2d 1301, 1307 [9th Cir 1990]). In doing so, mindful of the principles of contract still interwoven in this context, courts overseeing a class action cannot rewrite a settlement agreement or impose additional terms after judicial approval, but rather must construe the agreement in accordance with the parties' intent, gleaned from the terms of the agreement and through the lens of equity imbued within the inherent nature of class actions (see Matter of TCR Sports Broadcasting Holding, LLP v WN Partner, LLC, 40 NY3d 71, 84 [2023]; Friar v Vanguard Holding Corp., 125 AD2d at 446; see also Beecher v Able, 575 F2d at 1016).
Here, it is undisputed that the settlement agreement does not specifically address how to distribute the unclaimed funds. Nonetheless, for the reasons that follow, we cannot say that Supreme Court abused its discretion in directing the unclaimed funds be redistributed to authorized class members. Such directive is not adding to or modifying the terms of the agreement, which expressly provided that the only entities to receive any compensation from the GSS were class counsel, the named plaintiffs, the claims administrator and the authorized class members; there was no provision affording return of funds to defendants. The other terms of the agreement provided that the authorized class members would receive their pro [*7]rata share of the NSS, which was defined as the remaining amount of money after deducting the awards to class counsel, the named plaintiffs and the claims administrator. In considering the intention of the parties to compensate the authorized class members by their pro rata share of the NSS based on the number of hours they worked "and the total amount of service charge collected by [defendants]" during the years at issue, "permitting reversion of the unclaimed funds to th[ese] defendant[s] would be equivalent to awarding [them] the benefit of [their] own wrongdoing, a result which should not be sanctioned" (Friar v Vanguard Holding Corp., 125 AD2d at 446; see Klier v Elf Atochem N. Am., Inc., 658 F3d 468, 479-480 [5th Cir 2011] [finding redistribution of unclaimed funds to the class members warranted under a settlement agreement that authorized the initial distributions pursuant to a pro rata formula]). When further considering other sections of the agreement, including that the provision for class counsel fees were based on one-third (33%) of the total amount to be paid by defendants — and not based on the total amount of claims made by class members [FN3] — the underlying construction of the agreement evinces an intent for defendants to be disgorged of $1.2 million, with the exception to only receive a partial refund should Supreme Court reduce the award to class counsel or the named plaintiffs (see 4 Newberg & Rubenstein on Class Actions § 13:7; see also Masters v Wilhelmina Model Agency, Inc., 473 F3d 423, 437 [2d Cir 2007]; see generally Gascho v Global Fitness Holdings, LLC, 822 F3d 269, 282 [6th Cir 2016], certs denied 580 US 1114, 580 US 1114 [2017]). Accordingly, we perceive no basis to disturb the determination of Supreme Court ordering redistribution of the unclaimed funds to the authorized class members (see Friar v Vanguard Holding Corp., 125 AD2d at 446; Six [6] Mexican Workers v Arizona Citrus Growers, 904 F2d at 1309; Van Gemert v Boeing Co., 739 F2d at 738; see generally Beecher v Able, 575 F2d at 1016-1017).
Lastly, we are mindful that Supreme Court found defendants to have breached their covenant of good faith and fair dealing by contesting redistribution of the unclaimed funds, but we need not — and do not — find defendants' contentions premised on bad faith (see Trump on the Ocean, LLC v State of N.Y., 79 AD3d 1325, 1326 [3d Dept 2010], lv dismissed & denied 17 NY3d 770 [2011]; Desco Vitro Glaze of Schenectady v Mechanical Constr. Corp., 159 AD2d 760, 763 [3d Dept 1990]). We have examined the remaining contentions of the parties and have found them to be without merit or rendered academic.
Lynch, J.P., Ceresia, Powers and Mackey, JJ., concur.
ORDERED that the order is modified, on the law, without costs, by reversing so much thereof as determined that defendants breached the settlement agreement and the covenant of good faith and fair dealing; motion denied to said extent; and, as so modified, affirmed.

Footnotes

Footnote 1: This provision is contained in two separate subsections of paragraph 50, with the clause at issue containing identical language except that subsection 50 (c) used the term "Settlement Fund" and subsection 50 (e) used the term "Qualified Settlement Fund."

Footnote 2: During oral argument, defendants' counsel acknowledged that the employment taxes of approximately $87,000 were in addition to the $1.2 million.

Footnote 3: We recognize that there is an important significance to the type of class action settlement, namely being a "common fund settlement" as opposed to a "claims-made settlement," which often dictates the disposition of the remaining settlement fund (including unclaimed funds) after the claims window has closed (4 Newberg & Rubenstein on Class Actions §§ 13:7; 15:70).